The next case on the docket is 518-0583 Carpenter v. Meyer. Mr. Jones? Yes, thank you. May it please the court, counsel. I am Aaron Jones. I represent the plaintiff and appellant in this matter. That would be Laura Carpenter. She is a plaintiff individually and in her capacity as a representative of the estate of Matthew Lindsey. This case, as I'm sure the court noted from the briefs, was born out of a horrific tragedy. Matthew Lindsey was an 8-year-old boy with severe autism, the son of my client Laura Carpenter and Shawn Lindsey, who are both here this morning. On the night of October 25th of 2016, Matthew left the residence of the family without the knowledge of his parents. He walked out to nearby Route 50 in Marion County, Illinois, and entered the roadway. At that same time, the defendant, Marla Meyer, was driving her vehicle eastbound on Route 50, traveling approximately 60 miles an hour. She struck Matthew Lindsey, and she struck him with the passenger side of her vehicle. And as a result of the accident, Matthew Lindsey died from his injuries. Other than the deceased and Ms. Meyer, there were no eyewitnesses to the accident. At the trial court level, Ms. Meyer filed a motion for summary judgment, which was ultimately granted by the trial court, and this appeal followed. The arguments that I raised at the trial court level are essentially the same that we're arguing here again today, that there are genuine issues of material fact that should prevent the entry of summary judgment in favor of Ms. Meyer. We have a couple different reasons for that, the first being, as I stated before, Ms. Meyer is the only living eyewitness to this accident. There were a number of things that she testified about that I think should cause the court to question whether a credibility determination is necessary. Let me ask you, Mr. Jones, why does she get to testify in the dead man's end? That's another issue that I don't know was really addressed at the trial court level, but that is an issue that I think has been raised in various cases, but I don't think the trial court really addressed that, and frankly, I didn't raise it either. Perhaps I should have, but that was not raised. I'm sorry, the minor is, as we have talked about, he is deceased at this point in time. There were no other witnesses to it. The Dead Man's Act certainly would apply to somebody who is a witness to something in circumstances where there is nobody who could testify that's still living, that's the other party, about the same event. And she has a financial interest. Yes, she does, in fact, have a financial interest. She meets all the criteria of the Dead Man's Act. She is an interested party, I agree. Even if you take her testimony, let's consider her testimony. Go ahead. I think that, first of all, by its very nature, and this is perhaps the reason why the Dead Man's Act, I think, is even applicable here, she is biased and she's interested in her outcome, the outcome of the case. She may believe that she is being objective, but I think that the court is allowed to question whether a jury would question whether she's trying to help herself with her testimony. She did have some bizarre things and a few things that I found inconsistent that I highlighted in my brief and with the trial court. First of all, and it may seem like a minor thing, but whenever she gave her report to the Illinois State Police, she said that she was going 60 miles per hour with her cruise control set. Then whenever she's giving her testimony later, she said she was going 55 miles an hour and she seemed to not want to admit that she might have actually been speeding. Now, that seems like a minor thing, but it goes to the point that I'm trying to raise, which is she seemed to be trying to help herself and to indicate that maybe she wasn't actually speeding. Well, how does that raise a genuine issue of fact? It's a credibility. I understand what you're saying, but I think that goes to credibility. Credibility isn't a genuine issue of material fact, though, is it? But for summary judgment purposes, the case law says credibility determinations cannot be made at that stage. They're to be made only by the trier of fact. So I do think that it's crucial to the issue of whether summary judgment can be granted under the circumstances. But doesn't there have to be some relevancy to what she states before you make a credibility? I mean, you never get the credibility unless what you're talking about is relevant. Well, I think it is relevant if she was speeding versus not. I mean, one is a violation of the statute. For example, if she stopped in time at 60 miles an hour versus 55 miles an hour. That goes to the issue of the expert, and I don't think that issue has been that specific point. I think he determines that there's a difference of between 1.7 to 2.2 seconds, depending on how fast she was going at the time, and also a basis of the headlights, whether she was using high beams or low beams. She did not recall. Well, if you go through all the machinations, you know, 60 low beams, 60 high beams, 55 low beams, 55 high beams, could she have stopped? She had seen the child approaching on the right side of her vehicle, but she doesn't even claim that's where it came from. Well, and that, I think, goes to the genuine issue of material fact that I'm raising by the expert report. He says that based off his opinion within a reasonable degree of scientific certainty, using the figures and calculations that he made based off of whichever headlights she had, she had between 1.7 and 2.2 seconds. In his opinion, that is enough time at her speed, 55 or 60, to have slowed down and to have been able to avoid the accident or to swerve to avoid the accident since the testimony of Ms. Meyer was that there was no oncoming traffic. There was nobody around at the time this happened. Are you aware of any presumptions or any information from your expert about reaction time to stop? He talks about the calculations he makes are based upon her reaction time, based off her perception of when she should have seen him according to the beams that she was using. That's the difference between the 1.7 and the 2.2. If it was high beams, I believe it was 2.2, and low beams, 1.7 seconds is, I think, the reason for that difference. Right. That's how much time she would have had. Right. But, for example, in Missouri, and I don't know if this is still true, but when I was trying cases, Missouri had a presumption that it would take you like three-quarters of a second to stop. I'm not aware. Did your expert give any opinions like that? He didn't provide any opinion that's been submitted to the court on that. I don't know whether- Well, does he give an opinion that the 1.7 to 2.2 seconds would have been enough to avoid the tragedy? He does. Okay. So he gives you that much? He does give that much, and I assume that it's based off of that presumption, though he doesn't specifically give a figure for how he determined that in his opinion. He was not deposed. His opinion came in the form of an affidavit that I prepared based off the information that he gave to me, and then he signed it. He was-I suppose that if he were deposed at some point in the future or given a trial, or, excuse me, testified at trial, I would expect fully that he would get into all of those and explain fully how he calculated all of that beyond what's in his affidavit. I don't think there was any question, and the trial court didn't seem to question, nor did the defendant's counsel, that he is well-qualified in the field to provide these types of opinions and testimony. So why did the court not allow his testimony? The court basically found that all he was doing was speculating, number one, and number two, that nothing that he had to say was beyond the kin or common knowledge of the average juror. When I tried to push back on that and explain some of the things we've been discussing that I believe are beyond the common knowledge of the jury, such as this perception time and the high beam, low beam, and how far that would give somebody the ability to see under those conditions when it was dark, the court seemed to dismiss that and say that those are- Judge McCain indicated that those could be looked up on Google. Well, that's not really the standard. A jury can't be looking those things up on Google when they're trying to decide that. That doesn't mean that it's necessarily in the common knowledge of the average juror. If that were the case, anybody could become an expert on anything by going on the Internet in today's day and age. So I think that is not the proper standard, and I think that Mr. Kausert did distinguish himself as an expert. He does provide testimony that goes beyond, and opinions, I should say, that go beyond the common knowledge of what a juror would have and could be expected to know under those circumstances. So- Mr. Kausert has testified repeatedly in this district, hasn't he? He has, and he gives many opinions every year. I don't remember offhand the exact number, but I think he testifies and provides opinions, has for many years in this district and others in the state, and gives many depositions and testimony at trials, and he set that out in his affidavits just how extensive that experience is, and I think he's been recognized by an expert in many situations before. Was there any evidence in this case as to- when the driver knew she'd hit something but didn't go back to investigate? Can you talk about that? Yes. We raise that point because we, again, stress that that goes to the credibility of, you know, whether she believed that she had done something wrong, and, again, that's- she testified that it was just her emotional state that caused her to not do that, but she, by her own admission, did not go back to check on him at any point in time. But the reason why I say that that goes to the credibility is when you take that with the other part of her testimony, where she talks about seeing the image of Matthew Lindsay going up, not on the right side of the car where the impact was, but on the left side of the car in front of her, the description of him is a correct description from what the police report indicates with what he was wearing, his physical description, and she says she sees this image of him going up in front of her, and I was-initially when she indicated that, and that's actually something she reported the police to at the time, but at her deposition I was trying to find out what exactly she was saying, and she said she didn't see his physical body. She's seen his body essentially ascend to heaven or his spirit going to heaven in front of her, and I think a reasonable jury could question, you know, is that credible? Is it true that she didn't actually see him like she claimed, his physical body, whenever she provides this accurate description of him? And she says, though, that she never saw him before the impact. She never saw him after the impact. She never went to see him, period, but yet she provides this accurate description of him through this image or vision that she sees going up in front of her. Now, she may be 100% sincere that that's what she believes happened, but I do think that it calls into question whether a jury might find that credible or not under the circumstances. Well, was there any issue as to whether if she would have gone back, this child would have had a chance of survival or were the injuries too severe? That's a question that we have never been able to get an answer from a doctor or from an EMT as to whether that would have made a difference. The autopsy didn't indicate enough about that for us to be able to determine. We did file a survival count in this because of that possibility. That would be count two in the complaint. But we do not yet have any, and we may not be able to depending on, I mean, I have yet to find testimony or evidence from one of these that indicates clearly that she went and done something that would have changed things. We just don't know that at this point. We didn't quite get to that point before this summary judgment came up. You couldn't tell from the nature and extent of the injuries of the autopsy as to whether or not he had a chance of survival? I don't know. I haven't found information one way or the other on that yet. So I'm not prepared to say one way or the other this morning. All I can say at this point is it's a possibility. It is a potential question of fact, but not one that I've been able to say one way or the other on at this point. So your argument on the image that she saw is a credibility argument again? I think it is a genuine issue of material fact as to whether she, in fact, did see him beforehand and that that's what she actually, and she's just not remembering correctly, first of all, but I also think that it goes to credibility also as to believing that what she's saying is accurate, that she did not, in fact, see him. So I think it's a combination of the two. But when I say credibility, I mean, again, it is a question of it creates a genuine issue of material fact because a jury might believe that she's either not remembering correctly based off of what she's saying or she's intentionally trying to, again, paint herself in a more positive light by changing things a little bit from what actually happened. I will say this was a traumatic experience for her, too. I sat there at the deposition. I mean, she did testify also that things were a blur because of what happened. Well, she was on Prozac, wasn't she? She was on some Prozac, and I think she was on some other medications afterwards. She didn't believe those impacted her memory, but there's been... Did you get her medical records after the accident? We don't have her medical records now, but... Because I know that she was taken to the Clay County Hospital for non-accident-related injuries. What was that about? It was related to the emotional trauma from the accident. So you don't have those records yet? We don't have the records from her being there. Since her state wasn't, I guess, her physical state, there's not been a companion claim of any sort filed, so we did not subpoena those records. I mean, there was not a claim suing my clients for the injury and her claiming something, so we didn't request those since her injuries weren't an issue is what I'm saying. But you're arguing her mental state was an issue. All I'm indicating is that she, by her own admission, that her memory was a blur about the whole thing. I'm not specifically indicating that any medication necessarily altered her mental state. But at this point, you don't know. We don't know. I mean, she admitted in her testimony that her mind was a blur based off of what happened at the time and the emotional nature of realizing that she had essentially hit a little boy. So that's what I mean by that. Sorry I didn't make myself clear the first time. I was just wondering if, because somebody in my notes I have, somebody raised the issue of Prozac and other medication in the briefs, and I don't usually put which side did that, so I was asking about that. I don't believe that it was me that raised that. It was you? I don't believe that I raised that. Okay. I guess I would have to double check. No, I'm just asking questions, that's all. Sure. And then she was on Prozac and went to the Clay County Hospital for non-accident related injuries. So she did go there, and that was a different hospital than Matthew Lindsay went to. But, you know, ultimately the bottom line on all these things are that we think there are a number of different issues, genuine issues of material fact and credibility questions that would have to be made to take everything she's saying, especially whenever we're viewing everything in the light most favorable to the non-movement, which was my client at this motion for summary judgment. Between that and between the opinions that the expert, Mr. Cowsert, provided, it appears that there are multiple reasons why the trial court should have not granted summary judgment. We're here now for this court. It's a de novo standard. We would simply ask that the court reverse the trial court and deny summary judgment in favor of the defendant in this case for the various reasons that have been cited in the brief and discussed here this morning. And if there are no further questions, then we'll move on. Thank you. Thank you. You'll have a few minutes to close the case. Mr. Daniels. I please report to counsel. My name is Chris Daniels. I represent Marla Meyer in this matter. This is here as a result of the summary judgment hearing that was heard at the trial court level. To touch on some of the facts that were pertinent to this issue, the facts were that Mrs. Meyer was driving down an unlit area of Route 50 after she had taken her husband to the field. As she was driving down that unlit area, she said she was driving between 55 and 60 miles per hour. That's in the record. As she drove along that unlit area, she had the occasion to, unfortunately, and this is a tragic circumstance, unfortunately, collide with Matthew Lindsay. She indicated in her testimony she was not doing anything that was distracting. She was not texting. She wasn't talking on the phone. She was not doing anything as far as messing with the radio at the time. She was wearing her required glasses at the time. She said her eyes were trained on the road, going straight ahead within her lane of traffic. Prior to the summary judgment, in response to the summary judgment, Mr. Cowsert was retained by plaintiff. Mr. Cowsert was retained by plaintiff, and he gave some opinions, but he didn't provide any facts. And one of our issues is that under Rule 191, that facts are required to be included, not speculations. So, therefore, we believe that the affidavit supports that. What about the report he wrote? Pardon me? Mr. Cowsert. Yes. Do you know the report? Yes. They contain no facts? Is that your allegation? No, that he, the 191, is required to provide sufficient facts and not speculation. So our opinion is that, and the trial court didn't buy my argument at that time either, but my position is Rule 191 requires that they provide facts, give conclusions from the facts, instead of providing additional facts. And what he did in his report was actually start speculating about what position the boy's body might have been along the roadway to build the opinion that she would have a longer period of time to observe him there. And he gave three different options as well. Wasn't, well, the body had obviously been removed by the time he came along, right? Yes. And, but weren't there some indications about where the child was laying at the time of the accident? Yes, he was laying, if she was traveling eastbound, he was laying to the right by the driveway. Their home was just off of 50. His body was lying to the, beside the road, by the driveway, and along with some debris from the right front quarter panel of her vehicle. That's correct. So why can't Mr. Couser use that information, those facts, to determine the kinds of conclusions that you objected to? He could use those if he was going to interpret it correctly. He gave opinions that he might be crossing from the left to the right. He gave opinions that he, and when you give a conclusion like that, there's no evidence that he was ever on the left side of the road or in the roadway. The only fact... But your client says that he was on the left side. No. That's where she sees him, on the driver's side, where he's like an image, right? That's, she indicated the spirit going to heaven. That's correct. On the left side, not on the right side. Never the physical manifestation, but just the spirit going to heaven was what she indicated. I'm not sure what that looks like, but she identified clothing, the color of his clothing accurately. Right. How does that evidence get in under the Dead Man's Act? I don't think that we have to, we have to draw a line. And the drawing of the line that we would have is what her specific activities were up to the time of the impact. And she can testify about all of that up to the... I think she can. I think she can, because you can't testify... No, no, it's in her financial interest to give testimony one way or the other that might benefit her. It's testimony that would be related to what was said or done in the presence of the person. So she can testify about her speed coming up to that point. She can testify about the darkness. She can testify about that she was in a lane of traffic. I mean, there's going to be a line drawn at some point. But I think she can testify about all those things. And all those facts show no negligence on the way she was operating that vehicle, including the lights being on and her proper looking down the roadway, not being distracted. All of that is something that she can testify up to a certain point. I don't think she's prevented from testifying about that all the way. What about speeding? Didn't she admit speeding? 55 to 60. Well, didn't she tell the police officer that she was going 60? I believe she did. What was the speed limit? 55. Isn't that speeding? It is. But it's whether or not that specific act would have caused the injuries. That's the real inquiry. And so, therefore, the specific act of whether she was going down the road, if she doesn't see this young man, she doesn't see this boy coming, it doesn't matter if she's going 100 or 35 because still yet that did not cause the injuries. What caused the injuries was the fact that he came from the roadside into the right front quarter panel, where the damage was obviously located, and that that would have been an issue. So the material fact would be the speed would not be a material fact. Well, how could it not be a material fact because actually it works to your benefit if she's speeding because she has less time to stop. I mean, that's why the expert's conclusions that there was 1.7 to 2.2 seconds to stop becomes relevant. If she sees the amount of time she has to observe, get her brakes, and how fast from the time she hits a brake her car would have gone forward. All of that seems to me relative to the question Justice Moore asked you about speeding. Right. That's why an expert's important, right? No, if you have a five-mile differential on this, that's not going to be significant. One way or another to alter that reaction time period. How do you know what the reaction time is? I guess from past experience, I guess. Exactly. We're talking past reconstructions, really. Exactly. Past experts have told you what the reaction time is and then how long it takes to stop. All of that is within the realm of an expert, which is who he hired. But what we're missing is the fact that that expert would have to be provided some facts from the scene that indeed this young man was in her field of vision. The conclusion just as easily could be that he was because there was a little toy in his hand. He was a young boy. A little toy in his hand was found beside his body there. That little toy could have just as easily been playing with that toy along the side of the road and jumped up suddenly into the side of her or been running with that toy from the side of the house. Her client couldn't have been in the proper lane. Exactly. I'm just saying these are all speculations, though. We can't have an expert... We know where the child was found. That's in the police report. How can that be speculation? I'm sorry. Not where the child was found, but I mean where the child was coming from at the time of the accident. Yes. The speculation is about whether or not the child was running toward the road because my client didn't see him and nobody else saw him before the accident. Nobody can say whether he was coming at an angle, whether he was coming at whatever it might have been. All we know is that at that specific point he made contact with the side of her car and was obviously the tragedy occurred at that point. So all of those facts are speculation about where he would have been. Without those, the expert can't give an opinion because the facts that he has to work with is what's of the record. And those facts that he has to work with of the record are what we just described. She was going down. She saw nothing from the right. The first indication she had was the bump against the vehicle on the right side. And so, therefore, anything else is pure speculation. And the expert's opinion can't be utilized to try to provide more facts. It can be utilized to interpret the existing facts. And that's the point that I was trying to make to the trial court, that the expert's opinion was necessary that he focus on the facts there and not start creating new facts.  They're not opinions from the facts that are present on the scene. So that's the concern I had. Judge McKinney did not agree with that argument, did he? Well, the judge indicated that the expert itself was not going to provide any information that would be beyond the kin of the average jury, of the average juror. And so, therefore, that expert couldn't be used to support or contest a motion for summary judgment. And he's correct going to that part of it. If we're talking about speed, speed's not something that's beyond the kin of an average jury. And so, therefore, I don't know what other elements would be here, but if we're talking about a jury interpreting whether she saw the boy, that's not a scientific principle. I know the office being court- Well, what is the well-known reaction time for a person driving at night going 55 miles per hour? Do you know what your standard would be? I don't. Beyond the kin of the ordinary lawyer? Yeah. You do this kind of work. Right, right. So why isn't that subject to expert testing? Well, when I say I don't, I know that it was a- you take speed calculation, and that speed calculation is something that's determined according to- and I'm just repeating what- Right, but that speed calculation that you have 1.7 to 2.2 seconds to avoid the accident also needs, then, a reaction time and how much it would have taken. Could she have stopped? Those are all questions of fact for an expert. How can that be subject to the kin of an ordinary juror? We're assuming that we have a timeframe to provide those jurors. When I say a timeframe, there is no indication of- If she testified, yes, I saw him, and I slammed on my brakes, and I didn't get stopped in time, then there's a question about the observation, stopping time, and otherwise. But there is no evidence that we can actually give that first variable of when you first saw him to the time you actually reacted because nobody saw him. She didn't see him. Nobody saw him until he made impact with the side of her vehicle. So we're losing a variable. I don't think that expert opinion goes to the jury anyway because we don't have one of those variables in there about how far you see him to the time that you react because you don't see him. See what I'm saying? I'm sorry. And that's my issue with that. I guess my concern is in every case where a defendant who hits somebody says, I didn't see him, every case where we have that, how do we get around- How do you ever prove negligence in a case if you allow somebody to say, oh, I didn't see him? If we had some other facts. Nobody would ever be able to prove negligence unless you used an expert, unless you had an independent eyewitness, obviously. But the expert has to rely upon facts to come to their conclusions. He can rely upon the facts about those missing variables here. There's always missing variables when somebody says, I didn't see him. But there's a missing conclusion usually. The facts are there. It's just the conclusion missing. Then the expert puts that together for the jury to understand. What's the difference here from every other case where the defendant is allowed to say, well, I just didn't see him or I just didn't see her? I was going along. I was doing my thing. I mean, why would we ever show that anyone was negligent under those circumstances? If we allow even that person to testify to that. Right. If there's any factors that would indicate that of the known record, if there's any factors that the expert could utilize to plug into their formula for then educating a jury, that would be one thing. But in this case, there's no factors that the expert could plug into his formula that are known evidentiary facts in the case that would be used to expand or explain the knowledge of the jury. So it's just, I don't know how, but it just can't be done here. It just can't be done. And unfortunately, the circumstances are going to be nice if we had, you know, video and things like that to explain these cases. Do you think the fact that your client was on Prozac is wrong? I don't believe so. And the question is whether or not the medication you were seeing at the time is sufficient to cause you to otherwise compromise your ability to drive. And there's no indication, no facts here that it would compromise your ability to drive. Well, we do know that for some reason, it's in the brief somewhere, that she was taken to the Clay County Hospital for non-accident-related medical issues. And the plaintiff doesn't know what those are yet, right? Yes, she was. I'm assuming you wouldn't tell us right now. Yes, in her deposition, she indicated that she was, of course, very upset after that. Had somebody told her that she did a jive? She actually, it's contrary to what has been stated here, but she actually put on the brakes. She stopped within 390 feet. Even his expert said 350 is a reasonable time frame to stop after, you know, knowing something occurred. So 40 feet is not that big of a difference, once again. And she hit the on-start button, tried to contact somebody. Then she got up, she started waving her arms and screaming, trying to get people to stop and help. She began honking her horn. She began flagging down vehicles and passed by. In the course of five minutes, an individual did stop to help to take care of the situation. Now, yes, she was in a heightened emotional state. She had to be taken to the hospital, but she did all the steps that are reasonable. Well, my question, though, is did somebody tell her she hit a child? Because I know about the on-start and she called her daughter, but if, for example, she hit a deer, would she be that upset? No, I don't think so. So at some point, she must have known she hit a child or a person. Otherwise, why would she get so upset? Right. I believe she did because she took all the steps necessary to call 911, to hit the on-start. She tried to activate the emergency lights. She did that. She honked the horn and screamed. So, yeah, I think she was doing all those things, which would be consistent. Did she know she hit a child? Did she saw this image or spirit? Did she ever went back to check? I believe people came along at that time, that then emergency personnel and then a neighbor, she testified about a neighbor, actually went back and did the checking on the boy. That's correct. Did she testify in her deposition as to what she told the on-start people? She said it didn't work. She said she tried to get on-start, tried to stop and help, but it didn't work. How about her daughter? Was her daughter deposed? No. Did your client ever say to anybody before this passerby stop, I hit a child? I think she was told that. You think she was told? That it was a child. You don't think she told her daughter when she first called? I don't know that. No, I don't know that. Okay. The standards, of course, for the summary judgment is that we can't have pure speculation going on to the jury, so it is appropriate that a summary judgment be granted whenever it's pure speculation. Mere speculation, conjecture, or guess is insufficient to withstand summary judgment. It's our position that those opinions that came from Mr. Kalsertz were pure speculation. Each of the parties who actually testified in the case indicated that they did not see anything to the contrary of my client driving the vehicle in a manner that was reasonable and appropriate for the time. The suggestion of some material fact or some conclusion is not enough to survive summary judgment, and that's just standard information. Now, there was a comment made or some discussion in the briefs before about seeing the boy before the accident. This line of reasoning, again, is pure speculation about where the boy was located at the time of the accident because all the objective evidence shows that he was right over there on the right side, and the impact occurred at the right side of the vehicle. All the breakage of the light and the elements related to the front of the vehicle was over to the right as well. So, again, this issue about the spirit of the boy going to heaven was something that was pure speculation about him being on some other position on the roadway. And then, of course, the stopping the vehicle after the accident, they made some issue about that in the brief, stopping the vehicle after the accident. Like I said, 390 feet, even their expert indicated 350 feet would be sufficient to actually have a stopping distance. That's after he goes in. That's it. That's after the accident. That's correct, yes. But in looking at the affidavit, he is actually saying what her perception time would be, 150 to 194.3 feet. Right. How is that in the ordinary Canada juror? On that point, if it's 150, 190 feet, the point is that if the boy darks out from the side, no amount of feet is going to help him. The perception time is not going to help him. You don't know whether it was high beams or low beams. What did she testify? She said it was automatically. So I guess they automatically go to brights, is what she testified, because she was asked that. And she said it automatically goes, you know, it doesn't fade. At high beams, the projected illumination, if you will, is 250 to 300 feet. So if she could see him at 250 feet, which would be the low end on high beam, and you take the high end of 194 feet to stop, she would have missed him by 50, 55 feet. That's assuming she continued straight. No, she would have overrun him by 50 feet, right? She would have had 250 feet to see him. And at the moment she reacts, it would take her almost 200 feet to stop. So that's an extra 50 feet. See, we're having trouble. We're ordinary jurors. The stopping distance would be 350. That's assuming she continued straight on without doing any evasive maneuvers. Wasn't there evidence that there was no other traffic? Right. And so she could swerve, too, couldn't she? Wasn't that another evasive maneuver? Right now we're speculating and assuming one fact, and that fact is not present in this record that that boy was on that roadway at the time. That fact is nowhere on this record. Do we need that fact when we're talking about? I think you have to if you're an expert. I think you have to. Well, when you're talking about simply illumination, illumination of a roadway, I mean, deers dart out all the time, and people swerve. It's just a small sign. Don't hit them. Sometimes you do hit them. But it's a function of the illumination and the amount of time that you have to react and how much time that reaction time translates into in feet. That, in your opinion, is all within the cap of an ordinary driver. That's where I go back to. This was pure speculation. No, I'm just talking about what we know about illuminating headlines. I understand your inquiry on that, but I'm indicating we're providing a fact here that they speculated the fact that he was on the roadway, and then all those measurements match. My position has been all the way along that there's no facts that would support him being on the roadway at any time until he hit the side of that vehicle. So you don't think the illumination view of a headlight is relevant? It all comes down to where the child was. Well, my understanding is that the illumination would go straight down the roadway. It wouldn't catch him as he came over from the house. See, that's where I think we differ. Well, I guess the issue is how wide the illumination field is, and that also requires expert testimony, unless you know, unless you take the position that that's within the cap of an ordinary driver. I'm just thinking as a common person that my lights illuminate this way, they don't illuminate to the right and left, so therefore... You don't have peripheral vision on your headlights, a peripheral view, the side of the road? I don't believe it would. On a dark country road? Okay. Because those deer get in front of the car without ever seeing them coming in from the right, and so that's why I'm thinking that it would actually just be something where they would appear out of darkness and be the same issue that we have here, that it appears out of darkness. Okay. Thank you. Thank you very much for your patience. Okay, Mr. Jones. Thank you. Do you have anything? Not much, Your Honor. I would just say all these issues that have been discussed here, I think, highlight the points that we were raising in our brief. Mr. Daniels, you know, the points that he raised in his brief in response. I mean, the Augustine case is one that I cited with regard to this expert issue. The reason I cited it was because it's a Fifth District opinion. It goes through great detail of the history of, you know, when you can provide expert testimony, when it comes into play. And, you know, they cite a few cases that even indicate when there's a factual issue not precisely addressed by eyewitness testimony, it can be brought in. I would say we maybe have that here with regard to this issue about where the boy was, since Ms. Meyer herself doesn't even intend to say for certain where he was at at the time. Also, there's a case cited that says it's settled that where there is no available eyewitness testimony to an accident, other than the defendant herself, expert testimony may be introduced as a substitute for. And what's the name of that case? That is Fakhoury v. Fakhoury v. I'm sorry. Just spell it. F-A-K-H-O-U-R-Y, I believe. The Vapor Corp. That's 154 Illap 3rd, 531 on page 537. It's a First District case from 1987 that is cited in the Augustine case that I put in my brief. So I think that's all Mr. Calster is doing. I think his testimony does provide information beyond the ordinary knowledge of a juror, a common juror. For that reason and for the other reasons I cited about the issues with the credibility of Ms. Meyer's testimony and the other issues of material fact raised by her testimony, we would just ask that the court deny the summary judgment in favor of defendant, thereby reversing the trial court. Thank you. Thank you. Okay, gentlemen. That's now going to be taken under advisement. No issue with order. Thank you.